## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DERRICK WIGGINS, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | Case No.: **2:21-cv-00686-RDP** |
| | } | |
| CRH AMERICAS MATERIALS, INC., et al., | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on (1) the Motion for Summary Judgment filed by Defendants CRH Americas Materials, Inc. ("CRH"), Oldcastle Materials Southeast Inc. ("Oldcastle"), and Midsouth Paving, Inc. ("Midsouth") (collectively, "Defendants") (Doc. # 86); (2) the Motion for Partial Summary Judgment filed by Plaintiff Derrick Wiggins ("Plaintiff") (Doc. # 92); and (3) the parties' respective Motions to Strike. (Docs. # 99, 103). The Motions have been fully briefed. (Docs. # 83, 86, 87, 93, 97, 100, 111; 91, 92, 101, 102, 114; 103, 113; 99, 112). After careful consideration, and for the reasons outlined below, (1) Defendants' Motion for Summary Judgment (Doc. # 86) is due to be granted in part and denied in part; (2) Plaintiff's Motion for Partial Summary Judgment (Doc. # 92) is due to be denied; and (3) both Motions to Strike (Docs. # 99, 103) are due to be denied.

### I.    Background

This case involves Plaintiff's allegations of retaliation under the False Claims Act ("FCA"). He claims that while he was employed by Midsouth, he reported two instances of fraudulent quality control testing and was later terminated for reporting these instances and opposing them.

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts or the facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Midsouth[1] is part of the Oldcastle Materials Group, which "is the leading vertically integrated supplier of aggregates, asphalt, ready mixed concrete, and paving services in the United States." (Doc. # 83-2 at 7). Oldcastle Materials Group is the "fourth largest aggregate and asphalt producer in the USA and the largest producer of asphalt products." (*Id.*). It is a division of CRH, which is a global building materials business, based in Dublin, Ireland. (*Id.*). CRH's clients, and in turn Midsouth's clients, include government and regulatory officials and agencies. (Doc. # 83-5 at 25).

In July 2015, Plaintiff began working for Midsouth in Dothan, Alabama as a quality control manager. (Docs. # 91-1 at 16-17; 97-15 ¶ 1). Midsouth describes the role of a quality control manager as "a skilled position requiring the management of the quality control department and working to ensure and verify the quality of concrete and aggregate products." (Doc. # 101-1 at 2). The duties and responsibilities of a quality control manager include, among others, managing the daily operations and functions of quality control, developing testing schedules and procedures, working to ensure company policies and procedures receive strict observance, and reporting on all aspects of quality control to the management team. (*Id.*).

While Plaintiff worked as a quality control manager, his job duties included overseeing the quality control program during testing and production "as well as mix design responsibility." (Doc.

---

[1] As of October 9, 2023, Midsouth Paving, Inc. is now APAC-Alabama, Inc. (Doc. # 83-1). However, for purposes of this opinion, the court will refer to the company by its name when this case was filed – Midsouth.

# 91-1 at 17). He explained that "mix design is paperwork that goes to [the Alabama Department of Transportation ("ALDOT")] with materials for them to approve the mix." (*Id.* at 18). He testified that it was his job to be a "mix designer," meaning that he "put various aggregate together, combine[d] them with liquid asphalt, . . . [and] r[a]n tests to assure the mix complied with [certain] specifications." (*Id.*). However, although he had mix design responsibilities, he further testified that he "wasn't very involved in the mix design process [as he] was supposed to be[,]" because other people at Midsouth "were doing [the mix design process] when [he] wasn't there." (*Id.*). But, he testified that he wanted to be involved "because [he] was directly responsible for the results as a quality control manager." (*Id.*).

Plaintiff, like all employees, received training regarding the company's attendance policy and the policy regarding communicating with company personnel. (Docs. # 83-2 at 39-40; 83-3 at 23; 83-4 at 2; 83-5 at 9; 83-6). Additionally, Plaintiff, like all employees, received training regarding the company's policies against (1) fraud, (2) retaliation for reporting suspected fraud, and (3) the various ways to report fraud, including using the anonymous hotline number dedicated to reports of fraud. (Docs. # 83-2 at 12-13; 83-3 at 22; 83-5 at 35). Plaintiff acknowledged that he read Midsouth's Employee Handbook when he received it, and specifically testified that he read about Midsouth's complaint procedure. (Doc. # 83-2 at 22). Furthermore, Plaintiff signed a form acknowledging that he understood Midsouth's complaint procedure, and that included an acknowledgment that he was aware he could direct his complaints through multiple alternative avenues, including his immediate supervisor, the local human resources department, the division human resource manager, or the anonymous hotline. (Doc. # 83-7 at 2).

Sometime around August 2016, Alex Murphree ("Murphree"), a quality and materials manager at Midsouth, became Plaintiff's supervisor. (Doc. # 91-3 at 8, 39). Murphree and Plaintiff

did not get along (Doc. # 83-8 at 12); however, in 2016 and 2017, Murphree gave Plaintiff satisfactory performance reviews. (Docs. # 83-36; 83-37). During Plaintiff's employment with Midsouth, he and Murphree worked on two projects that are relevant to this case: (1) the Eufaula Municipal Airport (Weedon Field) Improvements Project for the City of Eufaula, Alabama to rehabilitate part of the airport's runway (the "Weedon Field Project"); and (2) the resurfacing of a portion of State Highway 10 in Henry County, Alabama (the "Highway 10 Project"). (Doc. # 48).

Plaintiff testified that while working on the projects he witnessed two[2] instances of quality control fraud – one gradation test at the Weedon Field Project and one tensile strength ratio ("TSR") test at the Highway 10 Project.[3] (Doc. # 83-3 at 24-25, 56). He further testified that Murphree was involved in both instances. (*Id.* at 24-25). Plaintiff claims that he was terminated in retaliation for reporting and opposing these instances of fraud. (Doc. # 83-3 at 56).

A.    **The Weedon Field Project**

In September 2017, Plaintiff was working on the Weedon Field Project with Murphree. (Docs. # 83-3 at 27; 83-13; 83-14; 83-15). Plaintiff's role as quality control manager on the Weedon Field Project "was to ensure the day-to-day quality control testing during production" –

---

[2] In his response to Defendants' Motion for Summary Judgment, Plaintiff actually asserts that he witnessed three instances of fraud: "[t]he first, on the Wheedon [sic] Field Project, involved quality control fraud by Murphree" and "[t]he other two involved both quality control and quality assurance fraud, in which Murphree and ALDOT employees falsified TSR results and concealed each other's misconduct." (Doc. # 100 at 8). However, previously when asked in his deposition how many instances of fraud he witnessed, Plaintiff responded that is was only two. (Doc. # 83-3 at 25). He has not given a satisfactory explanation as to why his affidavit testimony is in contradiction of his deposition testimony. Accordingly, the court only addresses the two instances of fraud he testified about in his deposition. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

[3] Plaintiff's Second Amended Complaint alleges violations of the False Claims Act on three different projects: (1) the Weedon Field Project (Doc. # 46 ¶¶ 35-73); (2) the Highway 10 Project (*id.* ¶¶ 74-130); and (3) the Highway 131 Project in Barbour County (which is misidentified as "Highway 31" (Doc. # 83-3 at 25)). (Doc. # 46 ¶¶ 21-34). However, Plaintiff has admitted that he did not work on the Highway 131 Project. (Doc. # 91-1 at 18, 25, 71). Therefore, the court only considers Plaintiff's claims involving the Weedon Field Project and the Highway 10 Project.

4

meaning, the production of asphalt which included work in the lab as well as on the job site. (Doc. # 83-3 at 26, 18). Plaintiff explained that he would "check in and make sure everything was going all right with the [quality control] testing." (*Id.* at 26).

This project involved paving parts of the runway at the Eufaula Municipal Airport. (Doc. # 93-1). Midsouth designed three mixes for the project – binder layer, leveling layer, and surface layer. (Doc. # 83-3 at 27). Generally, while paving, the binder layer is put down first, then the leveling layer is installed, and finally the surface layer. (*Id.* at 28). Plaintiff testified that an engineer was required to approve Midsouth's design mixes for the project as the project involved the Federal Aviation Administration ("FAA"). (*Id.*).

The Project Manual for the Weedon Field Project contains the bid documents and the contract. (Docs. # 93-1; 93-2; 93-3; 93-4). The project's Advertisement for Bids states that "[a]ny contract(s) awarded pursuant to this ADVERTISEMENT FOR BIDS may be funded in part by a grant from the U.S. Department of Transportation, Federal Aviation Administration." (Doc. # 93-1 at 9).

Midsouth served as the Contractor (Docs. # 93-1 at 81-87; 83-10 at 3) and Barge, Waggoner, Summer & Cannon, Inc. ("Barge") served as the Consulting Engineer for the project. (Doc. # 93-1 at 8). Michael Cole was designated by Barge as the Project Manager/Engineer and was "the person with overall responsibility for contract administration of this project." (Doc. # 83-10 at 4). David Harrell was designated by Barge as the Resident Project Representative. (*Id.*). His responsibilities included "monitoring all aspects of the job, sampling materials for acceptance, . . . reviewing and analyzing all test results, assuring that work is within specification limits, advising the Contractor's Superintendent and Project Engineer of nonconformance and possible corrective

actions, and measuring quantities for payment." (*Id.*). Harrell also served as the FAA representative. (Doc. # 83-3 at 35, 41).

The Weedon Field Project contract defines the "scope of work" for that project and specifies that "[t]he intent of the contract is to provide for the construction and completion, in every detail, of the work described. It is further intended that the Contractor shall . . . complete the work in accordance with the plans, specification, and the terms of the contract." (Doc. # 93-2 at 75). The contract further states, "[a]ll work and all materials furnished shall be in reasonably close conformity with the lines, grades, grading sections, cross-sections, dimensions, material requirements, and testing requirements that are specified (including specified tolerances) in the contract, plans, or specifications." (*Id.* at 79). All work performed under the contract is subject to inspection by inspectors, the Engineer, the Owner, and must also be finally accepted by the Engineer. (*Id.* at 83, 85). Section 50-01 of the Weedon Field contract specifies the following:

> The Engineer shall decide any and all questions which may arise as to the quality and acceptability of materials furnished, work performed, and as to the manner of performance and rate of progress of the work. The Engineer shall decide all questions that may arise as to the interpretation of the specifications or plans relating to the work.

(*Id.* at 79).

A "contract item," also known as a "pay item," is defined in the contract as "[a] specific unit of work for which a price is provided in the contract." (Doc. # 93-2 at 65). Midsouth is paid for a "lot" – a contractually specified weight of asphalt – of Hot Mix Asphalt ("HMA"). (Doc. # 93-3 at 56). Pursuant to the contract, "[p]ayment for a lot of HMA meeting all acceptance criteria as specified in paragraph 401-5.2 shall be made based on results of tests for smoothness, mat density, and air voids." (*Id.*). Paragraph 401-5.2 outlines the "acceptance criteria" and states that "[a]cceptance will be based on the following characteristics of the HMA and completed pavement as well as the implementation of the Contractor Quality Program and test results: (1) Air voids, (2)

Mat density, (3) Joint density, (4) Thickness, (5) Smoothness, (6) Grade, (7) Stability, and (8) Flow." (*Id.* at 48).

Relevant to the Quality Control Program, the contract requires the Contractor to "develop a Quality Control Program" that "address[es] all elements that affect the quality of the pavement," including, but not limited to, "aggregate grading." (*Id.* at 53). The Contractor Quality Control Program is intended to "allow the Contractor as much latitude as possible to develop his or her own standard of control." (*Id.* at 12). The contract provides for "surveillance" by the Engineer of the Contractor's personnel, material, and equipment at the point of production, manufacture, or shipment for quality control, and remedies for noncompliance by the Contractor are specified. (*Id.* at 17-18).

The Quality Control Program must include quality control tests "necessary to control the production and construction processes," and the program must include testing for "aggregate gradation," and specifically "aggregate gradations shall be determined a minimum of twice per lot from mechanical analysis of extracted aggregate . . . ." (*Id.* at 53-54). Quality control tests are to conform to the standard methods of the American Society of Testing and Materials ("ASTM"), the American Association of State Highway and Transportation Officials ("AASHTO"), and others. (*Id.* at 15). The results of quality control testing are used to determine whether a production or construction process is "in control" or "out of control." (*Id.* at 17). If a process is determined to be "out of control," the Contractor is required to take appropriate corrective action as prescribed by the Quality Control Program. (*Id.*).

Midsouth's Quality Control Program for the Weedon Field Project states, "[a]ny two consecutive [gradation] test results outside the Action Limits will result in a cessation of production until it is determined the problem has been solved." (Doc. # 83-11 at 4). Again, the

Weedon Field Project contract specifically allows for corrective actions to be taken if quality control tests indicate any issues. (Doc. # 93-3 at 17). If the Contractor does not take the appropriate corrective action or fails to maintain an effective Quality Control Program, the Engineer may (1) "[o]rder the Contractor to replace ineffective or unqualified control personnel or subcontractors" or (2) "[o]rder the Contractor to stop operations until appropriate corrective actions are taken." (*Id.* at 17-18).

For the Weedon Field Project, the Engineer was required to approve a job mix formula ("JMF") for each HMA mix. (Doc. # 93-3 at 35). One of the components of a JMF is aggregate gradation, or the aggregate particle size distribution, for the mix. (*Id.*). In a gradation test, a sample of dry aggregate is separated through a series of sieves with progressively smaller openings. (*Id.*). A gradation test is performed for each aggregate in the mix, and these are used to calculate the composite gradation for the mix. (Doc. # 83-12 at 43-44). The Weedon Field Project contract specifies a range of each aggregate that is required to pass through each size sieve and provides an "action limit," which is a range of passing percentages, for each size sieve. (Doc. # 93-3 at 37, 54-55).

On September 15, 2017, there were three gradation tests performed at the Weedon Field Project's HMA Lot 1. (Docs. # 83-13; 83-14; 83-15). The first two tests failed as the test results were outside the specified range for the mix. (Docs. # 83-13; 83-14; *see also* Doc. # 83-3 at 32). However, Midsouth did not shut down production after these two tests. (Doc. # 83-12 at 48). Murphree testified that he reported these two tests to David Harrell. (*Id.*). Murphree further testified that after speaking to Harrell and adjusting the mix, the third gradation test results passed. (*Id.*; *see also* Doc. # 83-15).

8

Plaintiff claims that the third gradation test was falsified because after the mix was produced, "what [Murphree] presented on paper was not the results of the test outcome." (Doc. # 83-3 at 29; *see also id.* at 24, 32). Plaintiff testified that the reason for that was because Murphree was using an inferior, less uniform, less expensive aggregate in the mix, which was outside the FAA specifications. (Doc. # 83-3 at 29). Plaintiff further testified that there were two pieces of paper he saw – one that showed a passing score on the test and one that showed the failing score. (*Id.* at 32-33). However, on the day after the gradation tests were performed, when Plaintiff came into work he could not find the piece of paper with the failing score. (*Id.* at 33). He further testified that because he could not find those failing test results, he had to send the other test results in his quality control report. (*Id.*). When Plaintiff sent his quality control report to people at Midsouth, he did not include anything in his report about his belief that the results were falsified. (*Id.*; *see also* Doc. # 83-32).

Whether the third gradation test actually passed or was falsified is a disputed fact, but regardless, after the third test was conducted, the Weedon Field Project continued on. (Doc. # 91-3 at 48).

When asked in his deposition whether a passing gradation analysis is a requirement for Midsouth to receive payment, Plaintiff responded, "[t]he actual pay factor, I believe, on the airport jobs was AC and air voids and density. But if the falsified test report would have been reported accurately, then, we would not have gotten paid for that." (Doc. # 83-3 at 40). Plaintiff testified that he based this statement on the specifications from the FAA. (*Id.*).

A few days after the September 15 gradation tests, Murphree told Plaintiff that someone needed to stay late at the Eufaula Lab. (Doc. # 83-3 at 37; *see also* Doc. # 83-34 at 2). Plaintiff testified that he normally delegated that work, so when Murphree asked him, he delegated the work

to Joey O'Brien, another Midsouth employee. (Doc. # 83-3 at 37). On September 22, 2017, Murphree wrote Plaintiff up for insubordination for leaving the Eufaula Lab "without saying he was going, nor checking to see if someone was indeed staying." (Doc. # 83-34).

A counseling session was then scheduled on September 28, 2017 to discuss the write-up. (Docs. # 83-12 at 42; 91-1 at 33-34). Phillips, Murphree, and Plaintiff attended the meeting. (*Id.*). During this meeting, Plaintiff accused Murphree of falsifying the gradation test results for the Weedon Field Project. (Doc. # 83-12 at 42).

Plaintiff reported his claims about the falsified test results only to Phillips. (Doc. # 83-3 at 33-34). Prior to the meeting on September 28, 2017, Plaintiff did not tell Murphree that it was a falsified report (*id.* at 34), and he did not call the anonymous hotline about his claims. (*Id.*).

Phillips made notes prior to the September 28 meeting in order to have a plan for the meeting and "[t]ry to find what was going on and try to remedy the situation to correct the things." (Doc. # 91-7 at 19-20; *see also* Doc. # 91-13 (Phillips's notes)). Phillips's notes included "items [he] wanted to address with [Plaintiff]." (Doc. # 91-7 at 20). When asked in his deposition whether he told Plaintiff at the end of the meeting "that if there were further or future similar actions that he would be dismissed[,]" Phillips responded, "[t]hat would be one of the points of the meeting was to say that as a last resort. If [Plaintiff] didn't correct the actions that we felt were inappropriate, that that could, if he continued on the same path with the insufficient, you know, work performance, then that would be an option." (*Id.*). Phillips could not remember if he explicitly told Plaintiff he would be terminated; he testified that "[t]he purpose of the meeting was a counseling meeting to try to improve the situation." (*Id.*).

### B.    The Highway 10 Project

The December 20, 2017 Project Contract recites the terms for the Highway 10 Project. (Doc. # 93-5). The project consisted of widening, planing, resurfacing, and striping a portion of Highway 10 located west of the junction of County Road 25 to east of the Vann Mill Creek Bridge in Abbeville, which is located in Henry County. (*Id.* at 2). ALDOT's 2012 Standard Specifications are incorporated into the contract. (*Id.*). The contract provision that is pertinent is Special Provision No. 12-2431 – Quality Control and Quality Assurance ("QC/QA") Requirements for Hot Mix Asphalt ("HMA") Pavement. (*Id.* at 121-129). Special Provision 12-2431 states, "[i]n all cases, the Department's testing will be separate from the Contractor's testing and both shall be conducted by certified technicians." (*Id.* at 121).

"Quality control" is the Contractor's responsibility while "quality assurance" is ALDOT's responsibility. (*Id.*). As part of its quality control responsibilities, the Contractor is required to "provide and maintain a quality control system that will provide reasonable assurance that all materials, product, and completed construction submitted for acceptance conform[ed] to contract requirements . . . ." (*Id.*).

As part of ALDOT's quality assurance responsibilities, "[a]ll materials will be evaluated for acceptance and payment through the Department's Acceptance Procedures specified herein. The Department will be responsible for determining the acceptability and pay factor of the construction and materials incorporated therein." (*Id.* at 125). The section of the Highway 10 Project contract titled "Basis for Payment" states in relevant part that "[n]o payment will be made for unacceptable material." (*Id.* at 151).

The Highway 10 Project involved the use of 424 Superpave bituminous concrete mix. (Doc. # 83-22 at 10). For Section 424 Superpave Mixes, like that used for Highway 10, the contract

provides that payment "will be adjusted on the basis of acceptance test results" for air voids, asphalt content, and mat density. (Docs. # 93-5 at 128, 147, 150; 83-22 at 25).

The Highway 10 Project contract requires the Contractor to "provide and maintain a quality control system that will provide reasonable assurance that all materials, products, and completed construction submitted for acceptance conform to contract requirements." (Doc. # 93-5 at 121). The contract specifies that Section 424 Superpave Mixes "shall have a tensile strength ratio ("TSR") of at least 0.80 [or 80%] when tested in accordance with AASHTO T 283 as modified by ALDOT-361" (*id.* at 129), and "[i]f any TSR value falls below the minimum specified above, plant operations shall cease until corrective measures are taken." (*Id.*).

The ALDOT Bureau of Materials Testing Manual – ALDOT-361-88, Resistance of Compacted Hot-Mix Asphalt to Moisture Induced Damage – describes the procedure for TSR testing. (Doc. # 83-23 at 2-6). A TSR is intended to mimic the effects of moisture on asphalt pavement. (Docs. # 83-3 43; 83-12 at 46). In a TSR test, six asphalt samples are pressed into "pills" in a gyratory compactor. (Doc. # 83-3 at 43). Each pill is "broken" by a machine with a hydraulic breaking head, as this process allows technicians to measure how well the liquid asphalt is adhering to the aggregate. (*Id.*; Doc. # 83-12 at 46). Three of the pills are "conditioned" before they are broken by being placed in 140 degree water for twenty-four hours. (Docs. # 83-12 at 55; 83-3 at 43). The other three "unconditioned" pills do not go through the conditioning process before they are compacted (*i.e.*, they are dry). (Doc. # 83-3 at 43).

The TSR test allows the user to compare the amount of additional stripping, if any, that occurs when an asphalt mix is subjected to high moisture levels and this, in turn, determines whether additional anti-stripping agent should be added to the mix. (Doc. # 83-23 at 2-6). An anti-stripping agent is an additive to liquid asphalt that helps asphalt coat and adhere to the aggregates

in the asphalt mix and prevent stripping, which is when the liquid asphalt strips off of the aggregates in the mix. (Doc. # 83-12 at 46). Stripping occurs over time due to weathering and traffic but can be accelerated by moisture-induced damage. (*Id.*).

The Highway 10 Project contract specifically allows for corrective actions to be taken if quality control tests, including TSRs, indicate any issues. (Doc. # 93-5 at 129-130). Plaintiff testified that if a TSR test did not pass, then production would not be allowed to continue until the problem was rectified. (Doc. # 83-3 at 44).

During the Highway 10 Project, both Midsouth and ALDOT performed TSR tests. (*Id.* at 121; Doc. # 83-12 at 35). The March 10-11, 2018 test performed by Midsouth failed. (Docs. # 83-3 at 44; 83-8 at 9; 83-24). The second test performed by Midsouth on March 12-13, 2018 passed. (Doc. # 83-25). Plaintiff claims that the second passing TSR test was falsified. (Doc. # 91-1 at 25). The parties dispute whether the second TSR test passed or was falsified, but regardless, Murphree signed off on the results. (Doc. # 83-25).

Plaintiff testified in his deposition that he believed that a failed TSR test could result in a reduction in payment. (Doc. # 83-3 at 53, 55). Alan Ricks, a transportation manager at ALDOT, testified in his deposition that a TSR test "only determines anti-stripping. It's not a pay factor or a very significant test other than a requirement from the federal government that was put in our specs." (Doc. # 91-9 at 9).

On March 23, 2018, Plaintiff sent Midsouth's Regional Sourcing and Quality Control Manager Mike Fielding an email, informing him that "[Murphree] has tried to hide the fact that the design we're using doesn't pass a TSR." (Doc. # 91-25; *see* Doc. # 91-5 at 4, 19-20).

Also on March 23, 2018, Murphree wrote Plaintiff up for skipping a training session three days earlier, on March 20, 2018, that Murphree had advised him to attend. (Doc. # 83-35).

13

On April 9, 2018, Midsouth submitted an invoice to ALDOT for the Highway 10 Project and was paid nearly 106% of the contract price. (Doc. # 91-37). ALDOT later sought reimbursement from the Federal Highway Administration ("FHWA") for what it paid Midsouth. (Doc. # 91-40). In its letter to the FHWA, entitled "Certification of Materials and Tests," ALDOT stated the following: "This is to certify that the results of the tests used in the acceptance program indicate that the materials incorporated in the construction work, and the construction operations controlled by sampling and testing, were in conformity with the approval plans and specifications." (Doc. # 91-41).

Plaintiff's March 23 write-up led to a counseling session being scheduled for April 17, 2018 – a month after the TSR tests were performed on the Highway 10 Project – with Plaintiff, Murphree, and Phillips. (Docs. # 83-3 at 59; 83-29 at 21). The meeting was not scheduled to terminate Plaintiff's employment. (Doc. # 83-29 at 21).

On April 17, 2018, Plaintiff called Regional VP of Human Resources Greg Green to complain about falsified test results for the Weedon Field and Highway 10 projects. (Docs. # 83-3 at 59; 91-6 at 10, 19). The scheduled April 17 meeting was subsequently cancelled (Doc. # 83-3 at 59), and another meeting was held on April 20, 2018 with Plaintiff, Green, and Mike Fielding to discuss Plaintiff's fraud allegations. (Doc. # 91-1 at 60-61). Plaintiff also reported to them that ALDOT was involved. (Doc. # 91-5 at 9). Plaintiff testified that he continued to work after the April 20 meeting. (Doc. # 91-1 at 61).

On April 23, 2018, Murphree sent a text message to Green, Phillips, and Fielding, containing a screenshot of another text which stated, "Derrick texted Dusty (inspector with thomspon [sic] Eng) to call him that he needed some advise [sic] that he might need to file a suit against his employer." (Doc. # 91-27).

14

On April 27, 2018, Phillips and Fielding met with ALDOT's Area Operations Engineer for the Southeast Region, Chris Huner, to "let him know about [Plaintiff's] allegations" since Plaintiff had "made allegations toward ALDOT personnel." (Doc. # 83-38 at 15).

As discussed below, Plaintiff was terminated in late May 2018. Before his termination, Murphree, Fielding, Phillips, and Green were all aware that Plaintiff had accused Murphree and ALDOT of TSR-related fraud. (Docs. # 91-1 at 60-61; 91-3 at 34; 91-5 at 9, 19-20; 91-6 at 10; 91-7 at 14). Murphree admitted in his deposition that Plaintiff could "make me look bad by false – by admit – by – I can't think of the words – by accusing me of falsifying stuff to get me fired." (Doc. # 83-12 at 62).

### C.    Plaintiff's Termination

At 5:02 a.m. on May 2, 2018, Plaintiff emailed Murphree that he had a meeting out of town but would be working from his truck. (Doc. # 83-40). He also stated in his email, "I will need someone to cover the conference call @ 1:30 PM, since I will more than likely be busy at that time." (*Id.*). At 7:56 a.m. on May 2, 2018, Murphree responded:

> One can't help when one is sick, but a meeting is something that is typically scheduled in advance; you should have gotten with me yesterday on this.
>
> You were not at the Eufaula nor Dothan labs yesterday, and you did not make me aware you were not at work.
>
> If you have something scheduled that prevents you from being in attendance, you need to let me know in a timely fashion (with enough head's up, i.e. the day prior) so that things can be covered in your absence.

(*Id.*). On May 5, 2018, Plaintiff responded to Murphree's May 2 email stating, "Yes I was at work and I have already told you that." (*Id.*).

On May 11, 2018, Green emailed Plaintiff stating, "earlier I sent you the information for applying for FMLA for recent absences due to a health condition. I haven't heard back from you and I wanted to see if you have any questions on the process and your rights under the Act." (Doc.

# 83-41). Green also stated in his email, "[i]n any case, you need to make sure you are fully communicating with [Murphree] concerning your time off." (*Id.*).

On May 15, 2018, Murphree sent an email to Plaintiff with the subject line, "Timesheets." (Doc. # 83-42). In his email, Murphree stated the following:

> I haven't received an update from you since your email on Wednesday (5/9), stating you were unable to work.
>
> If you have an update on your situation, please let me know.
>
> Until you are able to return to work, I will submit time for Gary, Joey, and yourself to keep you from having to do this during your absence.

(*Id.*).

On May 16, 2018, Plaintiff received a letter from Green stating, "I understand that you have been absent for work for a medical condition that might quality for Short Term Disability/Family Medical Leave" and explaining how to apply for these types of leave. (Doc. # 83-43). According to Plaintiff, he does not know what caused Green to think he might need FMLA leave because "any day [he] was absent, [he] took in sick days that [he] had vacation built up for." (Doc. # 91-1 at 65).

Plaintiff was terminated on May 31, 2018. (Doc. # 83-39). Plaintiff's termination letter states the following:

> For more than a month, Glenn Phillips and I have been unsuccessfully trying to communicate with you regarding your absences from work. Though you are reporting time worked by e-mail, [Murphree] has not physically seen you at work for over a month, you have stated that you attended a meeting that does not appear to exist and you have reported hours at plants that are non-operational, or where no one on the ground has seen you during your alleged work time. You have been unresponsive (with a very few exceptions) to e-mails, texts, and attempts to call you, despite the fact that I have repeatedly asked you to keep [Murphree] apprised of your work status . . . .
>
> You have missed all hands meetings and almost every scheduled daily call for the last month. When asked to explain your behavior, you have been non-responsive or vague . . . .

16

> Because of your lack of communication, we are unable to discuss these serious concerns with you. Based on the evidence, your time submittals appear to be fraudulent, or, at a minimum, grossly negligent. Moreover, you have been routinely absent from required work activities for over a month. As a result, your job with Midsouth Paving is terminated effective May 31, 2018.

(*Id.*). The termination letter also requested the return of company property, including "laptop, iPhone, iPad, and uniforms." (*Id.*).

Plaintiff testified that he got the termination letter on June 1, 2018 after he got home from working in Eufaula. (Doc. # 83-3 at 70). According to Plaintiff, June 1, 2018 was his last full day at work. (*Id.*). He testified that on that day, he communicated with Gary Kinsaul, a lab tech in quality control. (*Id.*; Doc. # 83-8 at 4). Plaintiff further testified that Kinsaul was the last person at Midsouth he communicated with face to face. (Doc. # 83-3 at 70).

Midsouth's Employee Handbook details its termination policy. (Doc. # 83-2 at 16-17). It provides certain bases for terminating an employee, including, but not limited to, "violation of company policy," "repeated tardiness," "excessive absenteeism," "insubordination," and "falsification of records."[4] (*Id.* at 16).

Related to its attendance policy, Midsouth states that "two (2) or more unexcused absences in a twelve month period of time will be considered excessive and will result in disciplinary action up to and including termination." (Doc. # 83-2 at 39). Midsouth's policy states in bold font the following: "Regular attendance is an essential function of all [Midsouth] jobs." (*Id.*).

Plaintiff was asked the following about his attendance at work: "Is it your testimony that during that time period of May 2018 that you were working every day at the locations you were supposed to be working at?" (Doc. # 91-1 at 64). He testified that was "correct." (*Id.*). He further clarified that there are time sheets for the days he worked "other than the days [he] called in, that

---

[4] Midsouth also states that it "reserves the right to discharge an employee with or without cause and with or without prior notice." (Doc. # 83-2 at 17).

[he] took personal leave or [was] sick." (*Id.*). And he testified, "I worked every day that I did not take off that I had time for, vacation or sick, whatever you want to call it." (*Id.*).

Plaintiff was also asked the following in his deposition: "[T]he time submittals are fraudulent or negligent. You're routinely absent from work activities. And you say none of that's true?" to which he responded, "[c]orrect." (*Id.* at 69). Plaintiff further testified that it was "common practice" to report hours at plants that were nonoperational. (*Id.* at 66). When asked "how would anybody know where you were working at any given time other than you?," Plaintiff responded, "I couldn't tell you, to be honest." (*Id.*). He also testified that he worked from home "mostly every day at some point." (*Id.* at 67). When asked whether it was true that he missed almost every scheduled daily call for the month of May, Plaintiff responded, "I can't recall that at this time." (*Id.* at 68).

Phillips and Green both testified that they were not the sole decisionmakers in Plaintiff's termination. (Docs. # 83-29 at 6-7; 83-38 at 12). Phillips explained that "most of the information [he] had was from [Murphree, Green, and Fielding], because [he] was not having any direct conversations with Plaintiff." (Doc. # 83-38 at 12). And Green described it as a "joint decision" between himself, Phillips, and Midsouth's in-house counsel. (Doc. # 83-29 at 7). Green also testified that Murphree was involved in the decision "as far as giving – you know, providing information to us to – during that time." (*Id.*).

Plaintiff did not attempt to contact anyone at the company once he received the termination letter. (*Id.* at 69-70). He did not contest its contents, ask for reconsideration, explain that he had been working all along, or respond at all. (*Id.*).

After his employment was terminated, Plaintiff lost his health insurance and applied for unemployment benefits. (Doc. # 91-1 at 73, 78-79). Midsouth opposed Plaintiff's initial

unemployment filing, but did not oppose his appeal after he was initially denied unemployment benefits. (*Id.* at 73; Doc. # 83-29 at 24).

Plaintiff filed this action on May 17, 2021. (Doc. # 1). On December 8, 2023, Midsouth filed a counterclaim against Plaintiff seeking the return of company property. (Doc. # 66). On April 1, 2025, Midsouth filed a Motion for Voluntary Dismissal of Counterclaims (Doc. # 88), which the court granted. (Doc. # 94).

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (internal quotation marks omitted). "Upon making this showing, the burden shifts to the non-moving party, who must produce 'significant, probative evidence demonstrating the existence of a triable issue of fact' to avoid summary judgment." *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024) (quoting *Four Parcels of Real Prop.*, 941 F.2d at 1438). That is, the moving party must demonstrate that, on all the essential elements on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, "come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Four Parcels of Real Prop.*, 941 F.2d at 1438 (alteration in original) (quoting *Chanel, Inc.*, 931 F.2d at 1477); *see also* Fed. R. Civ. P. 56(e).

Although there are cross motions for summary judgment, each side must establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955);[5] *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard. *Matter of Lanting*, 198 B.R. at 820.

---

[5] The Eleventh Circuit recognizes that Fifth Circuit decisions rendered prior to the close of business on September 30, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

"The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." Wright, Miller & Kane, Federal Practice and Procedure § 2720, at 327-28 (3d ed. 1998). The court must still review the summary judgment record to assess if there are genuine disputes of material fact.

## III.    Analysis

Plaintiff asserts a single claim of retaliation in violation of the FCA in this case against all three Defendants. (Doc. # 46 at 58).

Before the court begins its analysis of Plaintiff's retaliation claim, the court first addresses Plaintiff's claims against CRH and Oldcastle. Defendants contend that CRH and Oldcastle should be dismissed from this action because neither employed Plaintiff; rather, Plaintiff was only an employee of Midsouth. (Doc. # 87 at 3). "It is a general principle of corporate law 'deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *Hilliary v. FlightSafety Int'l Inc.*, 2017 WL 11316735, at *5 (N.D. Ga. Oct. 20, 2017) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Typically, to be considered a joint employer, the parent corporation must be "in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1345 (11th Cir. 1999) (citations omitted). Plaintiff has made no showing whatsoever that either CRH or Oldcastle are joint employers with Midsouth. In fact, he did not respond to Defendants' argument on this point at all. (*See generally* Doc. # 100). Accordingly, because Plaintiff has not demonstrated that CRH and Oldcastle demonstrated any control over his employment, the retaliation claim against them is due to be dismissed.

A.    **Retaliation Under the FCA**

"Under the FCA, entities are 'prohibited [from] making false claims for payment to the United States.'" *Ruffolo v. Halifax Health, Inc.*, 2024 WL 1733968, at *1 (11th Cir. Apr. 23, 2024) (quoting *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1287 (11th Cir. 2021)). In other words, the FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). "Additionally, the FCA allows private plaintiffs 'with knowledge of false claims against the government' to file 'qui tam' actions – recovery lawsuits brought on the government's behalf." *Ruffolo*, 2024 WL 1733968, at *1 (quoting *Hickman*, 985 F.3d at 1287-88 and 31 U.S.C. § 3730(b)).[6]

The FCA "creates a private right of action for an individual whose employer retaliates against h[im] for participating in an FCA action or in response to other efforts the employee engages in to oppose a violation of the FCA." *Id.* (citing 31 U.S.C. § 3730(h)(1) and *Hickman*, 985 F.3d at 1287-88). Specifically, the FCA antiretaliation provision provides relief for employees who have been "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

As the Eleventh Circuit has explained, "[i]n an FCA retaliation case, as in a Title VII retaliation case, a plaintiff 'must begin by establishing a prima facie case,' by showing that '(1) []he engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3)

---

[6] The court notes that on September 30, 2024, the United States District Court for the Middle District of Florida dismissed an FCA case on the grounds that the qui tam provision of the FCA is unconstitutional. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024). This case is currently on appeal before the Eleventh Circuit. *See Zafirov v. Fla. Med. Assocs.*, No. 24-13581 (11th Cir. Oct. 29, 2024).

the adverse action was causally related to the plaintiff's protected activities." *Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota Ltd. P'ship*, 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997)) (footnote omitted).[7] If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Ruffolo*, 2024 WL 1733968, at *1 (citing *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997)). If the defendant does so, then a plaintiff has the burden of showing that the proffered reason is merely pretext to mask retaliation. *Id.* (citing *Holifield*, 115 F.3d at 1565).[8]

Plaintiff has moved for partial summary judgment requesting that the court find that undisputed facts establish all elements of his FCA retaliation claim – or at least there is no dispute as to one or more elements of his claim – and that he need not prove them to a jury at trial. (Doc. # 92 at 8-9). Defendants have moved for summary judgment requesting that the court dismiss Plaintiff's case in its entirety because there is no issue for a jury to decide in this case. (Doc. # 86).

### 1.    Statutorily Protected Activity

Plaintiff and Midsouth agree that an activity is protected under the FCA when the plaintiff shows that under the circumstances the plaintiff had an objectively reasonable belief that his employer is violating – or is about to violate – the FCA. (*See* Docs. # 87 at 20; 92 at 27).

---

[7] A plaintiff may also demonstrate retaliation under the FCA through direct evidence, *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1316 (M.D. Ala. 1999); *see also Percell v. Yorktown Sys. Grp., Inc.*, 2020 WL 6807472, at *4 (N.D. Ala. Sept. 20, 2020); however, Plaintiff here has not presented undisputed direct evidence of retaliation by Midsouth.

[8] Plaintiff argues in his response to Defendants' Motion for Summary Judgment that he can rely on the convincing mosaic framework and cat's paw theory to establish that Midsouth retaliated against him. He is incorrect. Retaliation under the FCA requires a showing of "but-for" causation, *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359 (11th Cir. 2020); *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015), which is incompatible with the convincing mosaic framework and the cat's paw theory. Indeed, the Eleventh Circuit has explicitly made clear that the cat's paw theory does not apply in FCA retaliation cases. *See Reynolds*, 620 F. App'x at 792.

Accordingly, a plaintiff "must provide facts that establish that []he had a 'reasonable belief' that a False Claims Act violation ha[d] occurred' – that a false claim for payment was submitted to the government." *Simon*, 2022 WL 391067, at * 7 (quoting *Hickman*, 985 F.3d at 1289). As the Eleventh Circuit has articulated, "the False Claims Act requires a false claim; general allegations of fraud are not enough. After all, liability under the Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Hickman*, 985 F.3d at 1289. Therefore, Plaintiff "must provide facts showing that a 'reasonable person' might have thought that a false claim . . . was being conveyed to the government for money." *Simon*, 2022 WL 391067, at *7.

Midsouth contends that the Weedon Field and Highway 10 contracts show that Plaintiff could not have had an "'objectively reasonable belief' that Midsouth engaged in fraud because the gradation and TSR tests are *quality control tests* which *may require corrective action but do not affect payment* to Midsouth because they are *not* acceptance tests and could *not* have affected the basis of payment for either project." (Doc. # 87 at 21 (emphasis in original)). Midsouth supports this argument by explaining that there is a difference between quality control testing and acceptance testing: "Quality control testing is carried out by the contractor during the production and placement of asphalt to allow the contractor to make adjustments based on the results, to identify new deficiencies before they become a problem, and to assure that the acceptance criteria are ultimately met" while "[a]cceptance testing is carried out before payment to allow the Engineer or ALDOT to determine that the finished project is acceptable based on its acceptance criteria or pay factors." (Doc. # 87 at 22 (citations and emphasis omitted)). Midsouth further contends that "[c]ontrol factors like gradation and TSR were not part of the 'basis of payment' for either the

24

Weedon Field or [Highway] 10 projects; therefore, quality control test results could not be the basis for a false claim to the government in either instance." (*Id.* (citations and emphasis omitted)).

The court is not persuaded by Midsouth's arguments.

### a. The Weedon Field Project

On September 15, 2017, three gradation tests were conducted at the Weedon Field Project. (Docs. # 83-13; 83-14; 83-15). It is undisputed that the first two tests failed. (Docs. # 83-13; 83-14; *see also* Doc. # 83-3 at 32). But, the parties dispute whether the third test passed. Midsouth argues that the test passed (Doc. # 83-12 at 48; *see also* Doc. # 83-15), while Plaintiff argues that the test was falsified. (Doc. # 83-3 at 29; *see also id.* at 24, 32).

Plaintiff testified that the passing test was falsified because Murphree was using an inferior, less uniform, less expensive aggregate in the mix, which was outside the FAA specifications. (*Id.* at 29). Plaintiff further testified that he saw two pieces of paper – one that showed a passing score on the test and one that showed the failing score. (*Id.* at 32-33). He also testified that on the day after the gradation tests were performed, when he came into work he could not find the piece of paper with the failing score. (*Id.* at 33). And, he testified that because he could not find those failing test results, he had to send the other passing test results in his quality control report. (*Id.*).

Midsouth points out that Plaintiff sent his quality control report to people at the company, but he did not include anything in his report about a belief that the test results were falsified. (*Id.*; *see also* Doc. # 83-32). Plaintiff reported his claims about the falsified test results only to Glenn Phillips. (*Id.* at 33-34). He did not tell Murphree that he thought it was a falsified report. (*Id.* at 34). He also did not call the anonymous fraud hotline about his claims of a falsified test result. (*Id.* at 34).

A "contract item," also known as a "pay item," is defined in the contract as "[a] specific unit of work for which a price is provided in the contract." (Doc. # 93-2 at 65). Midsouth is paid for a "lot" – that is, a contractually specified weight of asphalt – of Hot Mix Asphalt ("HMA"). (Doc. # 93-3 at 56). Pursuant to the contract, "[p]ayment for a lot of HMA meeting all acceptance criteria as specified in paragraph 401-5.2 shall be made based on results of tests for smoothness, mat density, and air voids." (*Id.*). Paragraph 401-5.2 outlines the applicable "acceptance criteria" and states that "[a]cceptance will be based on the following characteristics of the HMA and completed pavement as well as the implementation of the Contractor Quality Program and test results: (1) Air voids, (2) Mat density, (3) Joint density, (4) Thickness, (5) Smoothness, (6) Grade, (7) Stability, and (8) Flow." (*Id.* at 48). The contract requires the Contractor to "develop a Quality Control Program" that "address[es] all elements that affect the quality of the payment," including, but not limited to, "aggregate grading." (*Id.* at 53).

The Quality Control Program must include quality control tests "necessary to control the production and construction processes," and the program must include testing for "aggregate gradation," and specifically "aggregate gradations shall be determined a minimum of twice per lot from mechanical analysis of extracted aggregate . . . ." (*Id.* at 53-54). Midsouth's Quality Control Program for the Weedon Field Project states, "[a]ny two consecutive [gradation] test results outside the Action Limits will result in a cessation of production until it is determined the problem has been solved." (Doc. # 83-11 at 4). And the Weedon Field Project contract specifically allows for corrective actions to be taken if quality control tests indicate any problems. (*Id.*).

As quality control manager on the Weedon Field Project, Plaintiff's role "was to ensure the day-to-day quality control testing during production" – meaning, the production of asphalt which included work in the lab as well as at the job site. (Doc. # 83-3 at 26, 18). Plaintiff explained

that he would "check in and make sure everything was going all right with the [quality control] testing." (*Id.* at 26).

In his role as quality control manager, Plaintiff could have had an objectively reasonable belief that the allegedly falsified gradation test was a basis for a false claim. Liability under the FCA "'arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures.'" *Hickman*, 985 F.3d at 1289 (quoting *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103 (11th Cir. 2020)). As the Eleventh Circuit has stated, "[t]hat requirement matters" because "[a]n organization might commit, and its employees might believe it has committed, any number of legal or ethical violations – but the Act's retaliation provision only protects employees where the suspected misdeeds are a violation of the *False Claims Act,* not just general principles of ethics and fair dealing." *Id.* (emphasis in original).

Based on Plaintiff's understanding that Midsouth was receiving payments from the FAA for the Weedon Field Project and the payment factors outlined in the project's contract, Plaintiff could have reasonably believed that Midsouth was violating the FCA. When asked whether a passing gradation analysis is a requirement for Midsouth to receive payment, Plaintiff even testified in his deposition, "[t]he actual pay factor, I believe, on the airport jobs was AC and air voids and density. But if the falsified test report would have been reported accurately, then, we would not have gotten paid for that." (Doc. # 83-3 at 40). Plaintiff testified that the basis for this statement was the specifications from the FAA. (*Id.*).

The Weedon Field Project contract provides that, "[p]ayment for a lot of HMA meeting all acceptance criteria as specified in paragraph 401-5.2 shall be made based on results of tests for smoothness, mat density, and air voids." (Doc. # 93-3 at 56). Again, paragraph 401-5.2 outlines the "acceptance criteria" and states that "[a]cceptance will be based on the follow characteristics

of the HMA and completed pavement as well as the implementation of the Contractor Quality Program and test results: (1) Air voids, (2) Mat density, (3) Joint density, (4) Thickness, (5) Smoothness, (6) Grade, (7) Stability, and (8) Flow." (*Id.* at 48). Upon first glance, it appears that payment is based on the acceptance criteria, which includes (1) Air voids, (2) Mat density, (3) Joint density, (4) Thickness, (5) Smoothness, (6) Grade, (7) Stability, and (8) Flow (*id.*), and does not include any criteria related to gradation. However, "acceptance" also appears to include "implementation of the Contractor Quality Program and test results." (*Id.*). And the Quality Control Program must include testing for "aggregate gradation." (*Id.* at 53-54).

Again, and this bears repeating, the FCA's retaliation provision "only protects employees where the suspected misdeeds are a violation of the False Claims Act[;]" "[i]t is not enough for an employee to suspect fraud." *Simon*, 2022 WL 3910607, at *6 (quoting *Hickman*, 985 F.3d at 1289). So the question is based on the project's contractual language, could Plaintiff have reasonably believed that gradation tests were part of the acceptance criteria that had to be met to receive payment? If so, reporting that the gradation tests were falsified could affect Midsouth's payment from the government, as the Weedon Field Project received funds from the FAA. (Doc. # 93-1 at 9). While Midsouth contends that the gradation test was not a basis for payment, and this may ultimately prove to be true, the court concludes that Plaintiff has produced sufficient Rule 56 facts such that a jury must decide whether his belief that Midsouth's allegedly falsified gradation test led to fraudulent claims being submitted to the government was objectively reasonable.

### b.    The Highway 10 Project

For the reasons explained below, the court reaches the same conclusion on the statutorily protected activity regarding the Highway 10 Project.

ALDOT's 2012 Standard Specifications are incorporated into the Highway 10 Project contract. (Doc. # 93-5 at 2). As part of ALDOT's quality assurance responsibilities, "All materials will be evaluated for acceptance and payment through the Department's Acceptance Procedures specified herein. The Department will be responsible for determining the acceptability and pay factor of the construction and materials incorporated therein." (*Id.* at 125). The section of the Highway 10 contract titled "Basis for Payment" states that "[n]o payment will be made for unacceptable material." (*Id.* at 151).

The Highway 10 Project contract requires the Contractor to "provide and maintain a quality control system that will provide reasonable assurance that all materials, products, and completed construction submitted for acceptance conform to contract requirements." (*Id.* at 121). The contract specifies that Section 424 Superpave Mixes "shall have a tensile strength ratio ("TSR") of at least 0.80 [or 80%] when tested in accordance with AASHTO T 283 as modified by ALDOT-361" (*id.* at 129), and "[i]f any TSR value falls below the minimum specified above, plant operations shall cease until corrective measures are taken." (*Id.*).

For the Highway 10 Project, both Midsouth and ALDOT performed TSR tests. (*Id.* at 121; Doc. # 83-12 at 35). The March 10-11, 2018 test performed by Midsouth failed. (Docs. # 83-24; 83-8 at 9; 83-3 at 44). The second test performed by Midsouth on March 12-13, 2018 passed. (Doc. # 83-25). Plaintiff claims that the second passing TSR test was falsified based on the previous test's failure and the high TSR scores. (Doc. # 91-1 at 25). The parties dispute whether the second TSR test passed or was falsified. In any event, however, Murphree signed off on the results. (Doc. # 83-25).

Alan Ricks, a transportation manager at ALDOT, testified in his deposition that a TSR test "only determines anti-stripping. It's not a pay factor or a very significant test other than a

requirement from the federal government that was put in our specs." (Doc. # 91-9 at 9). Nevertheless, Plaintiff testified in his deposition that he believed that a failed TSR test could result in a reduction in payment. (Doc. # 83-3 at 53, 55).

Whether the second passing TSR test was falsified or not is disputed, but the court concludes that Plaintiff presented sufficient Rule 56 evidence that he believed the TSR test was falsified. And, after this alleged falsification (Docs. # 91-5 at 4, 19-20; 91-25), the Highway 10 Project continued, and Midsouth requested payment from ALDOT. (Doc. # 91-37). The question is this: has Plaintiff established by way of Rule 56 evidence that he could have had a "reasonable belief" that an FCA violation had occurred – that is, a false claim for payment was submitted to the government? *Simon*, 2022 WL 3910607, at *7.

The court concludes that Plaintiff has shown that under the circumstances, there is at least a material dispute of fact as to whether a reasonable person could have had an objectively reasonable belief that Midsouth was violating the FCA.

## 2.    Adverse Employment Action

Although there is a material dispute over whether Plaintiff engaged in statutorily protected activity, there is no question that Plaintiff has met the requirement that he show he was subjected to at least one adverse employment action. But here, only one.

Under the FCA, a plaintiff suffers an adverse employment action when he is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1). In his Motion for Partial Summary Judgment, Plaintiff contends that he suffered adverse actions when Midsouth "(a) terminated [his] employment, (b) wrongly opposed his unemployment benefits, and (c) filed a countersuit against him in response to this lawsuit." (Doc. # 92 at 31). The court agrees that Plaintiff's termination

was an adverse employment action as the FCA's definition for adverse employment action includes "discharge." However, the Rule 56 record does not show the other actions are adverse actions under the FCA.

Section 3730(h) of the FCA does not provide a cause of action for alleged retaliation that occurs *after* a plaintiff's employment has ended. 31 U.S.C. § 3730(h); *see also Taul ex rel. United States v. Nagel Enters., Inc.*, 2017 WL 4956422, at *4 (N.D. Ala. Nov. 1, 2017) ("This Court, like many, is persuaded that the most natural reading of § 3730(h) is that it does not create a claim for post-termination retaliation."); *id.*, at *4 n.5 (noting cases where courts have concluded that § 3730(h) does not cover post-employment conduct). Therefore, the fact that Midsouth opposed Plaintiff's initial unemployment benefits is not an adverse action for purposes of FCA retaliation.[9]

The counterclaim initially brought by Midsouth is also not an adverse action under the FCA. Even if it did qualify as an actionable adverse employment action, Midsouth had a legitimate, non-retaliatory reason for filing the counterclaim against Plaintiff for the return of its equipment after Plaintiff's termination. Midsouth's company policy requires the return of all equipment following termination and Plaintiff's termination letter specifically requested that he return his company "laptop, iPhone, iPad, and uniforms." (Docs. # 83-2 at 16; 83-39). Here, Plaintiff did not, as directed, return all company equipment. (Docs. # 83-3 at 70). Therefore, Midsouth filed the counterclaim. It was not until after Midsouth's counterclaim was filed that Plaintiff returned the equipment. (*See* Docs. # 47 (counterclaim filed June 2, 2023); 101-12 (email exchange indicating

---

[9] The court acknowledges that post-termination conduct is not actionable under the FCA. Nevertheless, the court notes that, under Alabama law, there are limited reasons an employer may oppose a claim for unemployment benefits by a terminated employee. Those limited circumstances are where (1) there is an active labor dispute, (2) the employee voluntarily quit, or (3) the employee "was discharged or removed from his work for a dishonest or criminal act committed in connection with his work or for sabotage or an act endangering the safety of others or [drug-related misconduct]." Ala. Code § 25-4-78; *see also Ex parte Rogers*, 68 So. 3d 773, 775 (Ala. 2010). Midsouth appears to have contested Plaintiff's claim for unemployment benefits when none of these circumstances apply to Plaintiff's termination. Thus, it makes sense Midsouth did not appeal the award of benefits.

equipment returned October 5, 2023)). Accordingly, Midsouth has presented evidence of a legitimate, non-retaliatory reason for filing its counterclaim.[10] *See Tang v. Vaxin, Inc.*, 2015 WL 1487063, at \*5 (N.D. Ala. Mar. 31, 2015) (noting that a counterclaim is only retaliatory if it has "no basis in law or fact"); *see also id.* at \*5 ("The FCA would be quite a weapon if it allowed a terminated employee to sue his or her former employer and gave the employee another cause of action *every* time the employer counterclaimed) (emphasis in original).

### 3. Causal Connection

A retaliation claim under the FCA requires the plaintiff to establish that the adverse action occurred "because of" the employee's protected activity. 31 U.S.C. § 3730(h). This is a but-for causation standard. *Nesbitt*, 945 F.3d at 1359. "Under this standard, a plaintiff must 'show that the harm would not have occurred in the absence of, that is, but for his protected conduct.'" *Cervalli v. Piedmont Healthcare, Inc.*, 511 F. Supp. 3d 1363, 1370 (N.D. Ga. 2021) (quoting *Nesbitt*, 945 F. 3d at 1360).

"'The showing necessary to demonstrate the causal-link part of the prima facie case [of retaliation] is not onerous; the plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *United States ex rel. Rehfeldt v. Compassionate Care Hospice Grp., Inc.*, 2021 WL 2229057, at \*5 (M.D. Ga. June 2, 2021) (quoting *United States v. Lockheed Martin Corp.*, 905 F. Supp. 1343, 1348 (N.D. Ga. 2013) (in turn quoting *Mann*, 49 F. Supp. 2d at 1317)) (alterations in *Rehfeldt*). "To meet this standard, at a

---

[10] On April 1, 2025, Midsouth filed a Motion for Voluntary Dismissal of Counterclaims. (Doc. # 88). In its Motion, Midsouth noted that Plaintiff returned the company electronic devices after the original counterclaim was filed. (*Id.* at 2). On April 8, 2025, the court granted Midsouth's Motion. (Doc. # 94). It dismissed Midsouth's counterclaim seeking relief regarding the return of electronic devices and the related intangible information with prejudice. (*Id.* at 2). The court also dismissed Midsouth's counterclaim seeking the return of uniforms and personal protective equipment ("PPE"), and seeking relief regarding the disclosure of any confidential company information and trade secrets without prejudice. (*Id.*).

minimum, a plaintiff must show that his employer was at least aware of the protected activity" at the time the adverse employment action occurred. *Id.* (citing *United States ex rel. Sanchez v. Lymphatx*, 956 F.3d 1300, 1304 (11th Cir. 2010)); *see also Reynolds*, 85 F. Supp. 3d at 1375.

Plaintiff has presented evidence that "Murphree, Phillips, Fielding, and HR Green knew of [his] protected activity before he was terminated." (Docs. # 91-1 at 59; 91-6 at 10, 19). Around April 17, 2018, Plaintiff reported his allegations of TSR-related fraud to Green. (*Id.*). And, on April 20, 2018, Plaintiff met in person with Green and Fielding to discuss his fraud allegations. (Doc. # 91-1 at 60-61). He also reported to them that ALDOT was involved. (Doc. # 91-5 at 9). Moreover, it is undisputed that on April 23, 2018, Murphree sent a text message to Green, Phillips, and Fielding, containing a screenshot of another text which stated, "Derrick texted Dusty (inspector with thomspon [sic] Eng) to call him that he needed some advise [sic] that he might need to file a suit against his employer." (Doc. # 91-27). Therefore, the record contains evidence that before Plaintiff's termination, Murphree, Phillips, Fielding, and Green knew that Plaintiff had accused Murphree and ALDOT of TSR-related fraud. (Docs. # 91-1 at 60-61; 91-3 at 34; 91-5 at 9, 19-20; 91-6 at 10; 91-7 at 14).

Plaintiff has shown that at the time of his termination on May 31, 2018 (Doc. # 83-39), Midsouth was aware of his recent accusations of fraudulent quality control testing. (Docs. # 91-1 at 60-61; 91-3 at 34; 91-5 at 9, 19-20; 91-6 at 10; 91-7 at 14). Plaintiff has also established that his termination occurred shortly after her made Midsouth aware of this information. Therefore, the court concludes that Plaintiff has established the causal connection element of his prima facie case.

### 4.    Legitimate, Non-Retaliatory Reasons for Termination

As explained above, once a plaintiff has established a prima facie case, the burden shifts to the defendant to make a showing that it had a legitimate, non-retaliatory reason for the discharge.

33

*Ruffolo*, 2024 WL 1733968, at *1. Midsouth asserts that its legitimate, non-retaliatory reason for terminating Plaintiff "can be summarized as 'job abandonment.'" (Doc. # 87 at 30). To support its argument, Midsouth points to Plaintiff's termination letter, which plainly states that his "absences from work," unresponsiveness, absence from "all hands meetings and almost every scheduled daily call for the last month" were the reasons for his termination. (Doc. # 83-39).

Midsouth contends that "based on [Plaintiff's] own choice not communicate with Midsouth[,]" it "believed that [P]laintiff had abandoned his job and based its decision on that information rather than on his claims regarding one allegedly fraudulent gradation test and one allegedly fraudulent TSR test that purportedly occurred almost six months apart." (Doc. # 87 at 30-31).

Midsouth's Employee Handbook provides the following examples of why an employee may be terminated: "violation of company policy," "repeated tardiness," "excessive absenteeism," "insubordination," and "falsification of records." (Doc. # 83-2 at 16). Related to its attendance policy, Midsouth states that "two (2) or more unexcused absences in a twelve month period of time will be considered excessive and will result in disciplinary action up to and including termination." (*Id.* at 39).

Midsouth "has articulated 'clear and reasonably specific' non-retaliatory bases for its action[.]" *United States ex rel. Boodoo v. Ala. Psychiatry, LLC*, 2024 WL 3451632, at *9 (N.D. Ala. June 11, 2024) (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254-55 (1981) and *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1340 (11th Cir. 2023)). The court concludes that based on its policies, Midsouth has articulated a legitimate, non-retaliatory reason for terminating Plaintiff's employment. So, the burden shifts to Plaintiff to show pretext.

### 5.    Pretext

An employee attempting to rebut an employer's asserted legitimate, non-retaliatory reasons for an employment action is required to address the employer's reason head on. *United States ex. rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1342 (M.D. Ga. 2011) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)). That is, he "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc) (quotation marks omitted). An employer's reason is not pretextual unless it is shown both that the stated reason is false, and that retaliation was the real reason for this adverse action. *Id.* To be clear, a plaintiff does not meet his burden of establishing pretext unless he shows *both* that the reason was false *and* that retaliation was the real reason. *See Gogel*, 967 F.3d at 1136.

The court concludes that there is sufficient evidence in the Rule 56 record to create a genuine issue of material fact as to whether Midsouth was actually motivated by a retaliatory motive when it terminated Plaintiff. In other words, there is enough of a dispute that it is for a jury, not this court, to decide the question.

Although there is evidence in the record that Midsouth sent emails to Plaintiff about his absences, no one at Midsouth documented Plaintiff's alleged absenteeism. They previously did so for his insubordination in September 2017 and his missing a meeting in March 2018. But, Plaintiff disputes these emails (*see* Doc. # 91-1 at 64, 69) and testified that he was working during May 2018. In fact, he notes his last day of work was June 1, 2018, when he received the termination letter from Midsouth. (Doc. # 83-3 at 70). Furthermore, on this record, it is not for the court to decide whether Plaintiff was, indeed, absent from work based on the emails. For example, on May

2, 2018, Plaintiff emailed Murphree that he had a meeting out of town but would be working from his truck. (Doc. # 83-40). He also stated in that email, "I will need someone to cover the conference call @ 1:30 PM, since I will more than likely be busy at that time." (*Id.*). At 7:56 a.m. on May 2, 2018, Murphree responded:

> One can't help when one is sick, but a meeting is something that is typically scheduled in advance; you should have gotten with me yesterday on this.
>
> You were not at the Eufaula nor Dothan labs yesterday, and you did not make me aware you were not at work.
>
> If you have something scheduled that prevents you from being in attendance, you need to let me know in a timely fashion (with enough head's up, i.e. the day prior) so that things can be covered in your absence.

(*Id.*). On May 5, 2018, Plaintiff responded to Murphree's May 2 email stating, "Yes I was at work and I have already told you that." (*Id.*). This email exchange merely presents a "he-said, he-said" between Murphree and Plaintiff over Plaintiff's absence, not that Plaintiff was actually absent.

Plaintiff also received an email and letter from Green including information on FMLA leave. (Docs. # 83-41; 83-43). Midsouth appears to argue that the information provided about FMLA leave is indicative that Plaintiff was absent from work. However, according to Plaintiff, he does not know what caused Green to think he might need FMLA leave because "any day [he] was absent, [he] took in sick days that [he] had vacation built up for." (Doc. # 91-1 at 65).

Furthermore, it is undisputed that Murphree, Phillips, Fielding, and Green knew that Plaintiff had recently accused Murphree and ALDOT of TSR-related fraud before his termination. (Docs. # 91-1 at 60-61; 91-3 at 34; 91-5 at 9; 91-6 at 10; 91-7 at 14; 19-20). Plaintiff called Green on April 17, 2018 to complain about falsified test results for the Weedon Field and Highway 10 Projects. (Docs. # 83-3 at 59; 91-6 at 10, 19). This call led to a meeting on April 20, 2018, with Plaintiff, Green, and Fielding in attendance to discuss Plaintiff's fraud allegations. (Doc. # 91-1 at 60-61).

Additionally, prior to Plaintiff's termination, Murphree, Green, Phillips, and Fielding were aware that Plaintiff was inquiring about finding a lawyer to file a lawsuit against Midsouth. On April 23, 2018, Murphree sent a text message to the others containing a screenshot of another text which stated, "Derrick texted Dusty (inspector with thomspon [sic] Eng) to call him that he needed some advise [sic] that he might need to file a suit against his employer." (Doc. # 91-27).

Only a month and a half after Murphree, Phillips, Fielding, and Green became aware of Plaintiff's allegations, Plaintiff's employment was terminated. (Doc. # 83-39). The court concludes that this close temporal proximity when considered in combination with the other evidence about Plaintiff's termination is sufficient to raise a material issue of fact about whether the decisionmakers had a retaliatory motive. *See Gogel*, 967 F.3d at 1138 n.15 ("close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence"). And, to that point, Phillips and Green both testified that they were not the sole decisionmakers in Plaintiff's termination (Docs. # 83-29 at 6-7; 83-38 at 12), and that they received information from Murphree which contributed to the decision to terminate Plaintiff. (Docs. # 83-29 at 7; 83-38 at 12). At the point of Plaintiff's termination, he had accused Murphree of two instances of quality control fraud: one at the Weedon Field Project and one at the Highway 10 Project. (Docs. 83-12 at 42; 91-3 at 34). Murphree also admitted in his deposition that Plaintiff could "make me look bad by false – by admit – by – I can't think of the words – by accusing me of falsifying stuff to get me fired." (Doc. # 83-12). And, after Plaintiff's termination, they seemingly opposed his claim for unemployment benefits without good reason.[11] (Doc. # 83-29 at 24; 91-1 at 73). The court concludes that from this evidence, a reasonable jury could infer Midsouth had a retaliatory motive for terminating Plaintiff.

---

[11] Again, this does not present a standalone claim of retaliation. But, it is relevant to whether there was a retaliatory motive.

The court also notes that while Midsouth's Employee Handbook provides "excess absenteeism" as a basis for termination (Doc. # 83-2 at 16) and states that it "reserves the right to discharge an employee with or without cause and with or without prior notice" (*id.* at 17), a trier of fact could find that Plaintiff's termination was inconsistent with the prior disciplinary actions taken against him during his employment with Midsouth. In September 2017, Murphree wrote Plaintiff up for insubordination for leaving the Eufaula Lab without notice (Doc. # 83-34), and a counseling session was subsequently scheduled to discuss the write-up. (Docs. # 83-12 at 42; 91-1 at 33-34). And, in March 2018, Murphree wrote Plaintiff up for skipping a training session he advised him to attend. (Doc. # 83-35). This write-up also led to a counseling session being scheduled. (Docs. # 83-3 at 59; 83-29 at 21). Despite these prior actions by Midsouth, Plaintiff received no write-up nor a counseling session for his alleged absences at issue here.

Plaintiff has "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Midsouth's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136. For these reasons, the court concludes that there is a genuine issue of material fact as to whether Midsouth's termination of Plaintiff was pretextual.

## IV.    The Parties' Motions to Strike

Both Plaintiff and Defendants filed Motions to Strike (Docs. # 99, 103) after the parties filed their respective Motions for Summary Judgment. (Docs. # 86, 92). The court addresses each Motion to Strike, below.

### A.    Plaintiff's Motion to Strike

In his motion, Plaintiff moves to strike several declarations and documents relied on by Defendants in their Motion for Summary Judgment. (Doc. # 99 at 1). In analyzing Defendants'

Motion for Summary Judgment (Doc. # 86), the court only considered one piece of evidence that Plaintiff now moves to strike: the termination letter sent to Plaintiff. (Doc. # 83-39).

Plaintiff argues that the termination letter is inadmissible under the Federal Rules of Evidence because it contains purported hearsay statements from Green, Murphree, Phillips, and Fielding. (Doc. # 99 at 9-12). Plaintiff also argues that the statements in the letter are inconsistent with the testimony made by Green, Murphree, and Phillips. (*Id.* at 11). The court is not persuaded by Plaintiff's arguments.

The Eleventh Circuit has held that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999) (footnote and internal quotation marks omitted). These statements can all be reduced to admissible evidence at trial because Midsouth, as the employer of Green, Murphree, Phillips, and Fielding, can ensure that they will be available to testify to those statements at trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012).

Regarding Plaintiff's arguments that the termination letter contains statements that contradict deposition testimony, that is not a basis for striking this evidence. Plaintiff has merely pointed to what he believes is disputed evidence. To be sure, that is a routine, common occurrence at the summary judgment stage.

For these reasons, Plaintiff's Motion to Strike (Doc. # 99) is due to be denied.

### B.    Defendants' Motion to Strike

In analyzing Plaintiff's Motion for Summary Judgment (Doc. # 92), the court did not consider any of the evidence outlined in Defendants' Motion to Strike. (Docs. # 103). Therefore, Defendants' Motion to Strike (Doc. # 103) is due to be denied as moot.

**IV.    Conclusion**

For the reasons discussed above, Defendants' Motion for Summary Judgment (Doc. # 86) is due to be granted in part and denied in part, and Plaintiff's Motion for Partial Summary Judgment (Doc. # 92) is due to be denied. The parties' respective Motions to Strike (Docs. # 99, 103) are due to be denied. A separate order will be entered.

**DONE** and **ORDERED** this June 10, 2025.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE